May it please the court, I am Jonathan Eisenberg, Deputy Attorney General of the California Attorney General's Office, representing California. I would like to reserve five minutes for rebuttal. Let me begin my presentation. This case concerns a conspiracy among business competitors to constrain free market forces during a labor dispute. The conspirators, the supermarkets, have attempted to justify the restraint by virtue of a market disruption in the form of a labor dispute. More specifically, the supermarkets contend that this restraint helps them or has helped them get a hand up or an advantage in a battle against their unionized employees. The fact is that this is a – this agreement is nothing more than a profit pooling scheme, which has been – which is the kind that's been found to be per se illegal or automatically – pardon me – automatically constraining the incentives of the participants to compete vigorously in the marketplace across all dimensions of competition for a hundred years. The cases that we cited in the 19th century – But why doesn't this fall under non-statutory labor exemption? Why don't I – Why doesn't this arrangement fall under non-statutory labor exemption? The non-statutory labor exemption – I mean, we do know that there are certain things that firms can do in the context of a labor dispute that are per se not entitled to house violations, certain kind of conduct that wouldn't be okay in other contexts. Why isn't this exactly, you know, something that fits right in there? The arrangement was limited in duration to a labor dispute. It was designed to counteract concerted union activity directed against the employers or the – by the employers. And it was limited in time, and, you know, the activities were closely tied to the threatened strike or the actual – hello? The actual strike. So why isn't this exactly what the non-statutory labor exemption contemplates? I believe that the case of Brown v. Pro Football is the most instructive case on this point. The only case – It's the only case. Right. That concerns – It's the only Supreme Court case, but we have lots of – or a number of cases from other circuits that seem to have been pretty well accepted. Brown. That it was accepted Brown, Your Honor? Well, we have Brown from the Supreme Court. Right. And we've got some circuit cases that seem to be – We accept – Pretty well accepted, right? The State accepts that unilateral employer conduct can potentially be eligible for the exemption, but Brown v. Pro Football sets out factors that should be considered in a multi-factor analysis with the basic consideration being is there really a conflict between antitrust and labor law, and is the tactic something that's necessary to make the collective bargaining process work as Congress intended? Lockouts are fine, right? Yes. One employer gets struck, if I understand how lockouts work. One employer gets struck, and then other employers, in agreement with the first employer that's struck, locks out non-striking employees of their own, right? Correct. I don't see a material difference between that and what happened here. I mean, how do you – if you accept lockouts as being an activity that's covered by a non-statutory – what is it? NSLE. NSLE. Yeah, NSLE. I don't see why this isn't just like that. Lockouts are expressly contemplated in the labor statutes as something that employers can use. But it doesn't matter, because this is okay, too, under the labor statute. We're talking antitrust law. So the mere fact – the mere fact – I mean, if the idea is that if it's okay under the labor statute, it's okay under antitrust law, then you lose, because this is fine under the labor laws. I disagree that this practice is fine under the labor laws. There's no case that holds that this is a practice that is encouraged or invited or required or was even contemplated by Congress as the kind of weapon that an employer lawfully could use during a labor dispute. It is something that is wholly unnecessary to the resolution of collective bargaining disputes, as seen by the rarity of the practice. The U.S. Chamber of Commerce filed an amicus brief on the exemption question and could not cite a single case beyond the two cases involving the airplane industry 35 years ago and the railroad industry 50 years ago, where anything even remotely resembling profit-pulling had been used as a tactic in a labor dispute. This – this restraint is a rare kind of restraint. It's not at all necessary for a labor dispute to be resolved. Hundreds – Rare cuts against you because it suggests that it's limited. You know, lockouts are rare, too. They don't get used anything except in – during labor disputes. So the more – you know, if you say, well, this is just like something else that they would do, you know, this is like a monopolistic practice that would happen otherwise, then I'd be more sympathetic. But saying it's rare just tends to prove that it's – that it's something that will not be misused, will not be used outside the labor context. I disagree on several grounds with your point. Lockouts are much more commonly used in labor disputes than profit-pulling. They've been expressly blessed by Congress as an appropriate tactic. Profit-pulling is such a core antitrust violation, it goes to the very heart of antitrust when you – when you tell a business if you – if you compete, if you went out in the marketplace and you should be gaining market share, you're going to have to give away all of the fruits of that success to your rivals. But you're only getting – you're only getting market share because of a labor dispute. That's the key. You're not gaining market share by being more competitive or having better prices or better service or anything like that. It's entirely based on the fact that one employer gets hit by a strike. And thereby – and thereby loses market share as a result, as a consequence of the labor dispute. It says when that happens, as a common protective measure, we're going to make sure that whoever is the one that's struck will not go under and thereby pull the rest of us under. Your Honor, the facts show that the revenue sharing occurs whether there is selective picketing or not. One – one supermarket chain was gaining market share, I believe it was Ralph's, even before the pickets were pulled in this case, when all the supermarkets were picketed equally and revenue sharing was put into place. So revenue sharing is not that – or profit pooling is not that closely tied to the whip sign. Nonetheless, even if it were, it's a – I don't understand that statement. By its terms, the agreement isn't triggered until labor action comes in. Until there's a – pardon me. And labor action commenced when the picket lines went up at one of the employers. Revenue sharing or profit pooling is triggered by a strike. It's not triggered by whipsawing. In fact, it would apply in this case if Food for Less had had a separate labor dispute where there was only one employer. And by definition, you can't whipsaw against one employer. So the – I take your point that you're saying that the revenue sharing is not tied directly to labor pool, per se, and nor to specific labor actions such as whipsawing, because it was general. But I want to go back to a comment you made earlier, and that is you said you're focusing on profit pooling. But revenue sharing is not the same as profit pooling, is it? And if it is, does that – in your view, do you need to have that parallel analogy in order to make your point? Revenue sharing and profit pooling are very similar, and they operate the same way. In this particular case, what you have technically is a proxy for profits in the 15 percent of the revenues that were exchanged. But they essentially operate in the same way as they – That's not really a proxy for profits, per se, because as explained in the affidavits, the actual margin on these groceries is a very low-margin industry, 4 percent or something. So the way this is set up in terms of the excess revenues is really not a profit sharing pool, is it? Yes, it absolutely is. It's the profit on the – Before you answer that, then, is your theory, then, predicated on us treating this just like a profit pooling arrangement? It – our theory is not predicated on you treating it like a profit pool versus a revenue sharing agreement because the way that those – both kinds of practices affect competitive incentives are the same. The profit pooling was done on any excess gain or loss beyond the fixed market share for any particular – Revenue, not gain and loss. Revenue. Gain and loss in revenue. And then you take a percentage of that excess or incremental revenue, which is 15 percent, which the supermarkets calculated to be as close an approximation as they could make to the profits on those particular sales. So it eliminates the profit motive as closely as possible. That's why it's anticompetitive. Counsel, if we disagree with your view that the revenue sharing is basically the same as profit sharing, do you lose? No, we do not. Why not? Because the – whether there are distinctions, the distinctions are not material. The effect of either kind of agreement is to make all the participants stay together in their financial performance. If a company is falling behind either in profits or in market share and gets a payment, you can call it profits, you can call it revenue. It replaces revenues that would have been earned but were not by failing in the marketplace. So the laggard company is coddled and protected. It's the basic point that we've made, which we think is a common-sense point, which makes the dispute clearly fall under the per se or quick look rule. What case or stream of cases points us to this agreement as being per se a violation of the antitrust law? Citizens Publishing, Andreas, Anderson v. Jett, Wabash, Paramount Pictures. We cite a slew of cases. There's a hundred-year history of cases recognizing that profit pooling or revenue sharing has this inherent anticompetitive feature. Counsel, this is Judge Gould. If I could interject a question, please. Certainly. As I recall, the Citizens Federal case involves two newspapers that totally control the market and that agree to share profits for 50 years. Here we've got four companies that maybe have 60 or 70 percent of the market and they agree to share revenues, 15 percent of excess revenues, for a limited period of a strike of indefinite duration. So, you know, why isn't that enough? The fact that it's just the term of a strike plus two weeks and the fact that it's only part but not all of the market participants and the fact that it's revenue sharing rather than profit, why isn't that enough to put this case into the category where you'd want to take testimony of experts and let a full rule of reason analysis control? Your Honor, for a per se restraint or even a quick look restraint, market power is not something that the plaintiff needs to prove to prevail. And there are many examples of per se restraints where the conspirators didn't control the entire market. The Maricopa case from the U.S. Supreme Court was a case where there was a similar profit sorry, a similar market share to what we have here. It was about 70 percent, but that did not prevent the restraint from being deemed a per se restraint. The effect on competition is not, does not go away. It does not become pro-competitive just because the duration of the restraint is not for 50 years. If a company's formed a price-fixing cartel that lasted for a few months and then it broke up for whatever reason, there was still harm to the competitive process during that time period. If the court is to require a full-blown rule of reason analysis in a case like this where the anti-competitive restraints are so clear and so obvious in a common sense kind of way, then the per se and quick look rules have been emasculated. What happened in this case is the per se rule gets emasculated by the rule of reason because there's the feeling that at the judicial level that it's not so obvious that it should be decided categorically. So the idea that it gets emasculated begs the question. Your Honor, no, if I may say, if you insist on looking at factors like market power, no matter what the restraint is, then you are emasculating the per se rule or the quick look rule. If you insist upon looking at all of those factors, you take away the judicial economy that is created by the per se rule that says this is the kind of restraint either that courts have seen before or that it's so obvious on its face that it's anti-competitive that it would be essentially a waste of the court's resources and the litigants' resources to go through a sedulous, full-blown rule of reason analysis to see if this is one of the rare – pardon? You're saying that if this case had involved two supermarkets in the Los Angeles area, competitors had gotten together and agreed to a two-week equalization to prevent whipsawing between the two of them, that that would be per se illegal, even though that there would be clear competition from one of the three that is now in, say, Albertson's is in Safeway and Ralph's. And you've got all of the other Whole Foods, Trader Joe's, Costco and all of that. And it's limited for two weeks that that would still be a per se violation. It would still be a per se violation. Whether that anyone would bother to prosecute it is another question. But it would still be a per se violation, Your Honor. Well, the difficulty I have here is that, you know, we're supposed to know if we could have a confident analysis. And you stand up there confidently and say this is absolutely the worst possible anti-competitive. But if we stack up the experts' analyses, item by item, issue by issue, why isn't it difficult for a court to say, well, this expert is more correct than the other? Because your expert, for example, marches down traditional horizontal restraints, you know, profit pooling and that sort of thing. Doesn't tie it at all to the fact that this is a labor dispute. The other expert distinguishes the nature of these agreements. And we don't have, as far as I know, really any judicial predicate to benchmark this against. So in that case, why isn't this the kind of case that should go to trial? Otherwise, you basically have a court, or in this case a bank court, choosing between the two expert analyses, don't you? The labor dispute context that McCarthy, the Dr. McCarthy, the supermarkets expert, talks about gets fully analyzed under the exemption part of the case. A labor exemption was interposed and is fully evaluated. The labor context, other than that, is not something that changes the anti-competitive nature of the restraints. You say that. That's your point. But why is that the case? Why, I mean, saying, oh, this is just like any two firms deciding to profit share, you know, that would be a personal violation. That's right. I mean, if there are just two firms in the market for no reason at all decide to profit share, that's where that would be a de facto merger. But this is limited to the fact, situation where one of the employers is being crippled by a strike. So they're not able to compete normally in the marketplace. So this is not a situation where they would normally be there fighting against each other and be able to offer better services and try to get customers that way. It's a situation where one of the market players is crippled by a strike. So why isn't that sort of a big major factor that you want to overlook and say, oh, this is just a naked price fixing agreement? I'm not trying to overlook the fact, Your Honor. But that's exactly what you've been doing. Okay. Well, if I may, the labor context is not any more special than the health care context was when the Maricopa case was brought. The cases that said that because the restraint involves learned professions or involves a public service type profession, it somehow is different and the restraint isn't clear in that context and it's a novel situation. It's nothing like that. This is not an industry problem. Exempting an entire industry is really quite different from saying you have got a situation where the market can't operate in a normal fashion because one of the competitors is crippled by this circumstance. And if you want to talk about per se restraints, naked, you know, rather than rule of reason, you can't overlook that factor. And I don't intend to, Your Honor. The labor strike is a market disruption, but it's no different than any other market disruption where if one competitor is befalling a fate, the other competitors are supposed to take advantage of that in a free market. They are not supposed to help the competitors survive the bad time. If the strike befalls one competitor, that's too bad for that competitor. That competitor has to handle the situation and succeed or fail on its own. It's more complex than that. What they say is they are going to pull one down and then after they pull one down, they are then going to go after the next one and after the next one. So this is not a situation where there can be a feeding frenzy and, you know, we'll take the business done by the one competitor because of bad planning or bad management. This situation where there is a sort of common enemy and, say, instead of being picked off one at a time, we are going to band together to fight the common enemy, not to achieve the kind of goals that antitrust laws are designed to prevent. The competitors are allowed to band together for labor negotiation purposes. They are not allowed to band together and impose restraints on the product. That's the question, isn't it? That's the question. Why not when the case is that their objective is to lower their labor costs, which ultimately would translate into lower prices to consumers? Well, that argument fails for several reasons, the primary reason being how implausible it is. How you get from profit pooling during multi-employer bargaining to lower prices at the checkout lanes at the groceries is such a- No, wait a minute, because their theory is that that's what the driver is on raising their costs doing business, and if they can collectively avoid being whipsawed so that they ultimately get ratcheted up on labor costs, that ultimately will translate into at least maintaining or lowering prices ultimately. In a quick lit case where the defendants are allowed to proffer a justification like that, they must come forward with more than just a speculative theory. They must come forward with plausible and empirical evidence according to footnote 12 of CalDental. The supermarkets did not even make that attempt. They have the mere speculation of their expert who thinks that it's possible, but as our brief pointed out with the Rube Goldberg analogy, it's extremely unlikely that you get from profit pooling to lower retail prices, especially in this local market when these are all companies that operate nationally and could even use the savings if there were any in other markets. But the other reason that a pro-competitive justification of lower labor costs has not been recognized is because it is not an efficiency that the antitrust laws recognize. If I could give an example, I will, of an efficiency that the courts would recognize. If the supermarkets came together in a joint research venture and came up with some technology that allowed them to operate each store with 25 workers whereas it used to take 50, that would be the kind of efficiency that economics recognizes. Or if they found a way to make the 50 employers do 25% more work. Well, what lesson do we take from the auto industry that, you know, Well, there are many reasons that the General Motors went bankrupt, and I don't know if No, I understand that, but you're saying it's not plausible. Why isn't it plausible if you can't make the, you know, you're saying it can only be if it's a research, you know, research and development, get automated checkout and all of that, which, by the way, I don't think works worth a darn. Because And they're just trying to understand why Cutting labor No, wait a minute. I'm telling you what's bothering me. You know, the rule, you talked about eviscerating the per se rule. The concept of Quick Look, as I understand it, is that where there is some notion of uncertainty in the judicial evaluation of it so that we are not rigidly saying you can't do any of this because it fits within some label that has been rejected as legitimate, even if it's over-inclusive, that we should toss aside all of these doubts because it is so clear based on these examples from other contexts where the labor issue, for example, and the duration and the number of participants, the outside competition, you know, the kind of industry, why that wouldn't benefit from a more reasoned approach in a trial court. Each of those proffered probe committed justifications has already been rejected as a matter of law or is not plausible. If I could go quickly. I'm running out of time, and I would like to save some time for rebuttal. If I could go back to the point about lowering wage costs. That is, it operates like a fire cartel. It's not an efficiency. It's just paying your workers less money to do the same job. It's just moving money from the pockets of the employees to the pockets of the supermarkets. It's not an efficiency that the law recognizes. Counsel, does it make any difference to the analysis of either the non-statutory labor exemption or the antitrust analysis that there is a multi-employer bargaining group? And would the answer be any different with respect to those that are within the group, those that are not? The multi-employer bargaining context gives the participants an antitrust exemption in the sense that they're allowed to fix wages across employers. But it does not extend to tactics that affect primarily the product market. That's the crucial distinction. And I'm not certain I understood your point about the non-participants. Would you please repeat that? Well, I guess there are some that are participants, as I understand it, in the multi-employer bargaining unit, and there are some that are not. And I just wondered whether we're talking about it as if it's either all or nothing. And I wondered whether there's any middle ground where there's an extension of the multi-employer bargaining principle that would cover those employers versus the standalones. I beg your pardon. I'm not certain I understand what you mean by all or nothing. Well, I don't know how to explain my question any better. The kind of tactic of profit pooling would not be legal in the absence of multi-employer bargaining. It would not be legal in the presence of multi-employer bargaining. It doesn't make a difference. The effect of the profit pooling on the other companies in the marketplace,  I don't know. You better save your time. I think you should save your time. All right. Thank you. Okay. Thank you. We'll hear from the other side. May it please the Court. Craig Stewart, appearing for the defendants. The Grocers Mutual Assistance Agreement was a temporary defensive mechanism entered for the express and the admittedly valid purpose of combating union whipsaw tactics in the context of the multi bargaining, multi-employer bargaining, as Justice, as Judge Graber has just mentioned. There's two reasons why the judgment here should be affirmed. One is a matter of antitrust analysis. The State has waived the rule of reason claim. The only question is whether this may be summarily condemned without a trial or, indeed, without any evidence at all. That's the antitrust question. Second question is whether the nonstatutory labor exemption applies. Before you get into that, you said valid objective. And when I was talking to Mr. Eisenberg, he challenged my assertion that this was a proper tactic under the labor laws. So you can answer that now or you can weave it into your answer. But I would like you to address that point at some point. Thank you. Let me take that up right now, Your Honor. The Supreme Court in a long series of cases has recognized that one of the bedrock principles of labor law is that collective bargaining is most effective and achieves its purposes of reaching results that are mutually acceptable to the parties if they are permitted to use the economic weapons that are available to them. And in the context of multi-employer bargaining, the Supreme Court has recognized as recently as the Brown case that it's critical to effective multi-employer bargaining that the employers be able to maintain a common front. That's why unions engage in whipsaw tactics. It's to divide and conquer to try to strike a better deal. And the Supreme Court has recognized that it's a proper and, indeed, encouraged practice for the multi-employer bargaining unit members to have the ability to respond to those whipsaw tactics with the weapons that are available to them. It's not a matter of ---- Kennedy, in action, what is the status of this particular arrangement insofar as the labor laws are concerned? Has this ever been challenged before the board? Or has the board ever issued any of the most courts decisions approving or disapproving? Yes, Your Honor. There have been two court decisions, the airline pilots case which we cited from the D.C. Circuit, and the Kennedy case from the Second Circuit. In both of those cases ---- No, Your Honor, but it was covered by the Civil Aeronautics Board, which was governed by the ---- Justice Breyer's case, I think it is Brown, talks about the NLRB as being the group that determines what tactics are proper in these kinds of disputes. Do you have any case involving the NLRB? I have two cases. I have an NLRB general counsel decision and a regional director decision. Those aren't, admittedly, decisions of the board itself, but those are indicative of the position of the NLRB. And then let me come back, though, to the airline case and to the Kennedy case. In both of those cases, the court were ---- the courts were applying principles of the national labor laws. They were ---- But a different statute. That incorporated the standards of the national labor laws. If the court reads those two opinions, they are embracing and citing to the very same principles. Under the airline labor statute, you can join strikes, you can ---- the President can declare national emergencies, he can interfere with collective bargaining. They're not normal bargaining cases. Except in this context, Your Honor, where they were addressing the question of revenue share and mutual aid in the context of multi-employer bargaining, they were applying the same standards. They were reciting to the same cases that I've been citing to here this morning and the same principles about the importance of multi-employer bargaining and the legitimate goal of participants in that to maintain a common front. And I think it's important to recognize also in this vein that multi-employer bargaining itself is recognized as, say, an efficient ---- Has this ---- let me ask a question from the different, the opposite direction. Has this ever been challenged before the board? To my knowledge, it has not been, Your Honor. This kind of arrangement? There have been challenges made both in this particular strike and then in other contexts in the supermarkets where these grocers have entered into. Unfair labor practice charges were made and rejected on the ground that this is a valid economic defensive weapon that employers in these bargaining units are entitled to use. And so rejected by whom? In the one case, it was a regional director in Denver. In the other, it was the Office of General Counsel whose advice was sought. Well, let me come back, because what you've articulated is a rationale for what the grocers have done. And you've articulated in the context of multi-employer bargaining, which, of course, permits you to do a lockout and other things that would be mutual action. So that's the rationale that got you into this situation. But that doesn't really answer the antitrust question, which goes to the efficiencies of the economic arrangement, which is the revenue sharing. So can you shift to that? Because that seems to me to be what the focus has to be here. Yes. Go ahead. We're beyond saying that multi-employer bargaining has a social benefit and all, because everybody agrees with that. That's sort of like saying, yes, we all agree with that. But now get to the actual, I think, the harder question, and that's economic efficiencies. Okay. Let me get to that and just preface it just briefly, Your Honor, with the point that that rationale is indeed the very rationale that supports the application of the exemption here for the reasons that Judge Kaczynski mentioned at the outset. But let me turn to Your Honor's question about if we ignore the exemption, if we treat this simply as a matter of straight antitrust law, the State does not seem to be pushing the per se claim. I think for good reason. This does not fit into any recognized per se category. It seems to be pushing it pretty hard. I don't do you understand what emasculate means? In the lower court, Your Honor, and in the initial briefing in this case, it's absolutely clear the per se was their main argument. In fact, Quick Look was pretty much an afterthought. I'm responding to what I thought I heard this morning, which is they certainly are seeking summary condemnation. But they're seeking it, I think, primarily on the ground of Quick Look. So what is the standard for Quick Look? Quick Look requires that there be a great likelihood of anticompetitive effects that can be easily ascertained. And it's not proper if it's the restraint might plausibly, plausibly be thought to have a net procompetitive effect or no effect on competition at all. And then the third point with respect to Quick Look is the cases have consistently recognized the Supreme Court in the Caldental case, in the NCAA case, in the lower courts, the Third Circuit, the Sixth Circuit, and then Judge Sotomayor in the Second Circuit have all recognized that it's not proper when an empirical analysis is necessary to determine whether the conduct at issue is anticompetitive. So then the question here is, does this fall into that very limited category of cases? And I can't do that. And you have to have a plausible argument. The State has to have a plausible argument. The burden is on the State to justify the application here. I mean, it's a bit ironic that we're hearing the State cite footnote 12 of Caldental, because that is the footnote in which the Court says if you have to have empirical analysis, Quick Look is improper, and that assumption won't do. But that's exactly what the State is arguing here. They're assuming facts about the market here, state of competition, and saying that on the basis of those assumed facts, the Court should conclude that this is anticompetitive. But assumption won't do, as the Supreme Court has held. And if you look at the nature of this arrangement here, it's not a profit pooling arrangement. It's different from that for all the reasons that Judge Gould outlined. It was not a permanent arrangement among all of the participants in the market to permanently cease competition amongst themselves. Well, does it have to be permanent to be profit-sharing? I mean, it was, as I understood it, an estimate of profit, even though it wasn't measured specifically by profit. It was excess revenue designed to approximate profit, wasn't it? The 15 percent was chosen as a number that all three of them could agree upon. It obviously doesn't match their incremental profit margins, because that's going to vary by grocer and by the circumstances. But let's assume, let's assume that 15 percent did match their profit, their incremental profit margin. Each of these grocers still had overwhelming and tremendous incentives to remain competitive. You know, whether it has to be 25 years or 50 years or 5 years, here it was just an agreement during the duration of the strike. Suppose the strike had really been an intractable one and that it lasted 2 years or 3 years. Does that make any difference? I don't think it would, Your Honor, for this reason. The grocers never knew when that strike was going to end. And they had, therefore, two, at least two incentives during the duration of that strike that they would never know when it was going to end to remain competitive. The first is that this revenue sharing agreement didn't mitigate any losses that they might incur as a result of customers going to the stores that weren't being struck, to the stores that weren't part of this agreement. And that's, of course, precisely what happened during this strike. The market shares, the sales of the other stores skyrocketed. Stater Brothers, Costco, Trader Joe's, all of these stores got business during the strike. And this had nothing to do to protect the grocers against those losses. So they had a short-term, a median incentive to protect themselves against losses from their customers going to these other stores. And then in the long term, they had an incentive to not only not lose their customers permanently to the other stores that weren't part of the revenue sharing agreement, but also to the other stores that were part of the revenue sharing agreement. So if I'm honest with you Is your argument unique to this industry or would a decision here basically be applicable to other situations where you have multi-employer bargaining? I think it certainly applies in spades to this industry. And other industries, I think it may or may not. But one of the reasons why we know it applies in spades here is that the Supreme Court has recognized that the grocery industry is, one, very competitive. And two, repeat patronage is very important. That's the NLRB versus Brown case that we've cited in our brief. I don't think you're answering the question. Mr. McEwen was wondering about the spillover effects. If we hold the New York Times case in this case, what will we have to deal with in the future? Now, you can choose not to answer that, but then, you know, when we go to conference and discuss it, we won't have your answer. So if you don't want to answer it, it's okay, but it hurts you. I do want to answer it. Let me try to answer it better. I should try answering it. Thank you. I think that the analysis would be the same, whatever the case. If you have an arrangement like this, it's only temporary, where there doesn't encompass, that's entered only into the duration of a labor dispute, and it doesn't encompass all the participants in the markets, then the members of that arrangement have these incentives. Let's take a concrete example. Let's say a Home Depot was struck, and I guess there's Home Depot, there's Lowe's, there's one or two other large hardware chains, and your position would be that they would be in this, you know, whatever we have in this case would apply to that conference. I think it would. I would not see any distinction between this and that case, Your Honor, and I think it's worth emphasizing, perhaps, that what we're talking about here, when we're talking about the anti-trust side of this, it's not for a ruling from the Court that this does not violate the anti-trust laws. It's simply that it can't be condemned without analyzing it. Well, you're not relying on the Massachusetts labor exemption? I am. So that's when I say for the purpose of the anti-trust analysis, I mean, apart from the exemption. No, no, no, that's perfectly fine. I would say you are still also relying on the Lebanon argument. Absolutely. Absolutely. Well, at some point, I'd like you to get to that. Yes. But I don't want to pull you away from this discussion, which is obviously very important. Let me just make one final point with respect to the pure anti-trust analysis before we get to the exemption, because I think it's — How do you meet Mr. Eisenberg's point that this is just like a bunch of competitors in the market doing what is essentially a de facto merger, where they are sharing profits? Obviously, if competitors in the market decided we're not going to merge, what we're going to do is we're going to pool our profits and split them, that would be an anti-trust violation, pretty much a personal anti-trust violation, wouldn't it? Well, it would be analyzed under the standards that govern mergers if they were to actually merge. But here, it's not like that at all, Your Honor. I think that's my answer, is that the — for example, if — Effectively, at that point, they would no longer have a reason to compete. If they are pooling profits, they would no longer have any reason to undercut each other in prices or offer better service and try to steal each other's customers, because it wouldn't matter to them whether a customer went to A or to B. So that would pretty much be a per se violation, wouldn't it? Well, that would be like the Citizen Publishing case, Your Honor, and I think, yes, the Supreme Court held that that was — And what makes this case different? Why is this a shorter term per se, but nevertheless a per se violation? I think it's the same reasons that Judge Gould alluded to, Your Honor, and that I've been discussing, that unlike that case where it was a 50-year arrangement, the only two newspapers in town agreed — formed a separate corporation and put all their operations in that corporation. Here, these companies remained separate. They had to worry about their business when the strike ended, as they all knew it would. So they had to worry about losing business to Stater Brothers and to Whole Foods and to Costco. And they also had to worry about their customers going to Ralph's. The pickets were pulled from Ralph's but remained on Vons and Safeway or Vons and Albertson. And so those companies had to worry about Ralph's stealing all their business away. And that the shopping patterns — again, the Supreme Court has recognized that repetitive patronage is critical in this industry — that those shopping patterns would hold steady and that the customers would go to Ralph's and say, hey, I like it here. I like their produce section.  So if you're Vons, you've got to worry about that. And this revenue-sharing agreement did nothing to protect against that or to eliminate that incentive. Now, the State says, well, yeah, but, you know, there would be some reduction of incentive. But the question is, is there a great likelihood of anti-competitive effects that can easily be ascertained? And I think you have to do — Well, that goes back to my question, which you also didn't answer, and that is, what are the economic efficiencies? You never did. Yeah. Because that's the flip side of what you're talking about, that you never really did. Yes. Excuse me, Your Honor. Let me get to that now, then. The Supreme Court has recognized that multi-employer bargaining is an efficient process. In the banana-linen case, which we cite in our brief — We're talking about the efficiencies of having the revenue-sharing, not multi-employer bargaining. I'm sorry. That's what I was trying to get to, Your Honor. That the revenue-sharing is a vehicle for effectuating and making effective the multi-employer bargaining. That's how it happens. That's what the Supreme Court held in Brown, is that without the ability to maintain a common fund, all of the benefits of multi-employer bargaining, which we're taking as a benefit, would be lost. So you're talking about this kind of arrangement. I mean, so under your theory, because it's economically efficient to have multi-employer bargaining, it would actually be more efficient than if they had an even stronger agreement in terms of pure profit-sharing and not just revenue-sharing. Wouldn't that even be better? Well, it has to go to defending against the whipsaw tactics. I mean, the State says, well, our argument would allow for price-fixing. Right. But it doesn't, because price-fixing wouldn't ameliorate the effects of the whipsaw tactics. If they all price-fixed, but there's still the selected picketing going on, the customers are all going to go to Ralph's. They could price-fix and profit-share. That would even be better. They'd have a double arrangement, and then they would control, basically they'd control the economic side of the strike from their perspective. There's nothing in our position that necessitates at all that the Court endorsed price-fixing in this circumstance, because it does not go to the whipsaw tactics. Well, sure it could, because you could have anybody who's being picketed and who therefore might, customers could lower their prices by 50 percent. So they would encourage people to come, notwithstanding the pickets. I mean, you can certainly imagine a scenario where that could be arranged to offset the effects of the strike. Well, I think for purposes of the antitrust analysis, again, there's two strains of separate. For purposes of the antitrust analysis, that argument, whether it could be imagined that, you know, under certain scenarios, that there may be these anticompetitive effects, that would be something the State would be entitled to prove. They had full discovery in this case. They, on the eve of trial, after gathering all the facts, they elected to abandon the rule of reason claim and try to seek a ruling that they can prevail without even having to produce any evidence at all. So I think on the purposes of the antitrust analysis, that would be something that would be inquired into. For purposes of the exemption, I think it's the point that I was just making, that the exemption covers conduct that is intimately related to the collective bargaining process. Well, that seems to be in the eye of the beholder a little bit, because having a common front for bargaining purposes may mean things like, well, we're going to only offer, you know, so much vacation per year. But it doesn't necessarily cover the employers acting between themselves on the money side, does it? As to certain arrangements such as this, yes, it does. Judge Kaczynski alluded to lockouts. That is an arrangement among the employer side. It's not a subject of mandatory bargaining. It's not a term or condition of wages or employment related to employers. And it's not a sharing of money either. It's an actual direct labor action. What it does is it impairs the abilities of these companies to compete against each other in a much more forceful way than revenue sharing ever could. But it doesn't equalize the weaker against the stronger. It does. In fact, that's why it's been recognized repeatedly as valid. Well, it doesn't really. I mean, as between the owners of a club, for example, some clubs have deeper pockets than others. They can withstand a loss of revenue much more. The parallel would be if, you know, the New York Yankees, for example, subsidize, and I don't know baseball well enough, so I won't pick another one. Somebody lesser didn't have the box office. He'd be revenues in the bank. That's what you all were doing. You were shifting money around to prop up the profits. We were engaged in limited revenue sharing for the purpose of maintaining a common front against the whipsaw tactics of the unions. And I don't think that it is. But the impact, counsel, is, you know, you're saying you're going to, because it's a labor dispute, the consumer who's outside who would otherwise benefit from price competition is going to find 60% of the market that's sitting around now and have removed certain incentives to lower prices. Now, on the antitrust issue, Your Honor, that's the factual question that the State elect not to prove. With respect to the exemption question, the whole point of the exemption, if we assume that there's an antitrust issue, which, of course, we vigorously dispute, but if we assume there's an antitrust issue, for purposes of the exemption, that's the whole point of the exemption, is to give protection to competition and restricting agreements. That's what Brown held. And so the question then is the relationship of the conducted issue to the collective bargaining. And as Judge Kuczynski said ---- So, just so I understand, are you saying that because whenever it's a labor dispute, then the antitrust laws are off the table? No. That would not be correct, Your Honor, and that's not our position. We look to the ---- What's the threshold for deciding whether it's in or out, then? Well, we look to the principles of Brown. And one of the things where Brown ---- You say Brown, but it has been pointed out, and you take issue with it, is that Brown just talked about lockouts, not revenue sharing. And I don't think they're distinguishable, Your Honor, and for this reason. They ---- in both cases, there would be a ---- or certainly in the case of lockouts, there would be an obvious and dramatic effect on a company's ability to compete by locking out all their employees. And yet it's protected. And why is it protected? Because Brown says that the nonstatutory labor exemption exists to prevent the antitrust courts from determining in the area of industrial conduct what kind of practices are reasonable and which are not. Counsel, let me ask you a question that I didn't maybe communicate it very well to opposing counsel, but it's still of concern to me. It's my understanding that one of the employers, Food for Less, was not part of the bargaining as the rubric under which to protect the entirety of the arrangement. And maybe I have the facts wrong, and therefore the question doesn't make any sense. But if I have the facts right, how does the existence of the multi-employer bargaining that would cover three of these employers spill over to the freestanding employer? Well, the answer, Your Honor, is that Food for Less is not, in fact, a freestanding employer for these purposes. Well, it's not part of the same collective bargaining agreement. Correct. Am I right about that? That is correct, Your Honor. Okay. It's not part of this collective bargaining arrangement. But Food for Less is an operating division of Ralph's Grocery Company. Ralph's Grocery Company has about 200 Ralph's stores, and it has 100 Food for Less stores. And what happened during the strike is that when the Ralph's, Vaughn's, and Albertson's were struck and then picketed, customers went to Food for Less. And so all that revenue from Food for Less was redounding to the benefit of Ralph's. Okay. So you're not really bringing in a freestanding. You're saying it's part of the same company overall. And it goes directly to the reason to have the revenue sharing to ameliorate. So in your view, it still wouldn't cover the XYZ mom-and-pop store that wanted to join this arrangement? I don't think it would, no, Your Honor. Okay. Not at all. Or Stater Brothers. Excuse me? Or Stater Brothers. No. There would be no rationale there for including Stater Brothers in there. But it seems to me there's a clear rationale for including Food for Less, because it would the revenues that it gains would redound to the benefit of Ralph's, which would go directly to the disproportionate economic effect that the unions were trying to impose. Now, we're now in the middle of the discussion of the Nance statutory labor exemption, just to make sure we're clear. Yes. Now, there is something different of a lockout between a lockout where the employer, where each employer is acting vis-à-vis its own employees and shifting money around between competitors. I mean, there is something that's on the gut level that's different about those two things. And your position is that they are not that different. My position is they're not different in a manner that in any sense is relevant to the test for the non-statutory labor exemption, which is that it exists to make sure that the collective bargaining process can work in the manner that Congress intended, and so that the results can be mutually acceptable. And, again, the purpose of this, the express purpose, it's not disputed by the State, was to protect against the whipsawing union tactics. And the lockout provision prevents, protects against a selective strike, but it does nothing to protect against the selective picketing or other selective union tactics. And so it is tailored to that. It responds to that. In the language of Brown, it's not distance in time or circumstances from the policies that we've been talking about in any sense that is relevant to the non-statutory labor exemption. However, it seems to me that lockouts do restrain labor, and they thereby indirectly affect commerce. But the revenue-sharing provisions don't, didn't affect the availability of labor at all. In fact, all they did was guarantee during the time that they had and the two weeks later that there would be a pre-strike percentage share of aggregate sales. So, as such, then the agreement seems to affect competition rather than the bargaining process. And, therefore, I'm still having a tough time finding the connection, because I can find that Congress will authorize a lockout, and I see that lockouts are probably similar to But rather focuses on matters of competition, which then does not leave to connection to the lawful operation of the bargaining process. It focuses on maintaining a common front among these employers. That was the very purpose for which it was intended. Well, common front, but just to shift, if you will, the pre-strike percentage of their is a part of the process. On that point, Your Honor, I'd come back to the airline pilot's case, the Kennedy case, and the two NLRB decisions, the General Counsel Regional Directive decisions. Those aren't NLRB decisions. You know, a general counsel rejecting a charge is not an NLRB decision. Well, it's the D.C. Circuit and the Second Circuit applying the principles that we've been talking about here under the National Labor Relations Act. They recognize that this is an economic weapon used in response to WIPSOC tactics. Well, the unions could have challenged this in an unfair labor practice. And they did, Your Honor. And that's what was rejected by the NLRA or the, excuse me, the regional director, who has the authority. And that could have been taken up with the board. Excuse me? Could that have been taken up with the board? Yes, absolutely. Yes, absolutely. But it could be that it was not necessary to take it up with the board because the dispute may have been settled.  We don't know why, but it never got to the board. Well, in this case it did, Your Honor. But for purposes of the exemption and the concerns that we're discussing here, the board has the authority over these practices. And the unions have the ability to challenge them. Counsel, have you abandoned your argument that use of the revenue sharing, if successful, could result in lower wages that would inure to the benefit of consumers? No. No, we have not, Your Honor. That is part of the reason why. Well, that's certainly the reason that was driving the bargaining position here. And one of the purposes of collective bargaining is to allow the process to work so that the employers and employees can reach a mutually acceptable agreement that will create efficiencies. And I do think that in this context, in the multi-employer bargaining context, and keep in mind, the cases at the State sites about, you know, buyer cartels that can't set the wages, those were not, one, in the collective bargaining context, and, two, those are cases brought by labor, not by on behalf of consumers as this case is supposedly brought. And so in this context, that is a justification. My time is up, Your Honor. I'd just like, again, to point out that there are two separate and independent grounds. I think we know. Unless there are further questions. Thank you. Thank you. Mr. Eisenberg, I believe you have some time left on the clock. Yes. I'd like to make a point about the CalDental case. If you look at the restraint in CalDental, it really is hard to understand if it has pro-competitive or anti-competitive effects. It's essentially an agreement among dentists not to engage in deceptive advertising. The pro-competitive justification is embedded in the restraint. In this case, the pro-competitive justification that's asserted is not embedded in the restraint. The restraint is inherently anti-competitive, as even the supermarket's expert recognizes. The pro-competitive justification is something like the last domino in a chain of dominoes after the profitable has started the dominoes falling. It's not connected to the restraint, and, therefore, it's not proper to consider in the same way. The point that the ---- I mean, you say that, but I don't understand what you mean. Why isn't it connected and why isn't it proper? Those are conclusions. Because you can argue ñ well, I'll give you an example. You can argue that the restraint on deceptive advertising is inherently pro-competitive and that it protects competitors. Sorry, it protects consumers. You can't make that argument about profit-pulling. It may protect consumers. I'm not sure that it's inherently pro-competitive. Well, I think any limitation of advertising arguably is anti-competitive because you can use it as subterfuge for other things. You can make that argument. So at most you can say it's neutral. But it may ñ These will be competition. That's a ñ It may be pro-consumer. Pardon? It may be pro-consumer in the sense that it makes for a more informed consumer or better informed consumer. It does not make it pro-competitive, which is a different concept. But it's ambiguous. It's not obvious in the same way that it is here. There's nothing inherent about profit-pulling that can be pro-competitive. You have to try to link it to something else to make it pro-competitive. That's my point. Mr. Rosenberg, haven't you effectively conceded that if we don't buy the per se or quick-look analysis and we have to go to a full rule of reason analysis, that the State cannot meet its burden by dismissing your claim? No. The reason that we ñ the main reason that we dismiss the claim is we want a clear ruling that this conduct is illegal rather than a rule of reason case that would mean that any time any business tries to do profit-sharing, we have to go through a full rule of reason trial to win the case. There's ñ we would have to go through a fact-intensive analysis that is not ñ that does not set a clear precedent for businesses and is inefficient to ñ But wouldn't it always be true if the Court concludes that a per se or a quick-look analysis just won't work because of the complexities of the ñ Absolutely, but not in this case. And if I may say, if any time the defendant could say my market is so competitive that the restraint can't have an effect, you would not have a per se rule even for horizontal price-fixing. Okay. Thank you. Thank you. Thank you. Thank you.
judges: Kozinski, Schroeder, Reinhardt, Graber, McKeown, Fisher, Gould, Tallman, Rawlinson, Clifton, Nr Smith, Cjj